Good afternoon. You are in the 1st district appellate court of Illinois, the 1st division thereof. And we are here to have oral arguments in the case of the people of the state of Illinois versus Rakeem Jackson. Case number 1 dash 23 dash 1200. My name is Terry lab, and I'll be presiding today along with my colleagues, justice, really a and justice. Cynthia cops, and the way we generally do this is we're looking for 15 to 20 minutes from each of you. And the 1st, 5 minutes or so will be uninterrupted. Try to just let you. Lay out your case, and the appellate should save some time for. Rebuttal. So, we will hear from the defendant. Appellant good afternoon. Good afternoon. May it please the court. My name is Annie Izzy from the office of the state appellate defender on behalf of the appellant. Mr. Rakeem Jackson, and I'd be requesting to reserve just a few minutes for rebuttal. In this case, Mr. Jackson was convicted by a judge of armed habitual criminal. On appeal, he has raised 2 issues 1st, is that the circuit court aired and denying his motion to quash arrest and suppress evidence. The 2nd issue is that the armed habitual criminal statute is unconstitutional on its face. And as applied to him in light of the new test under. I plan to focus my argument today on issue 1, but I'm also prepared to answer questions as to issue 2 as well. This case is about an initially legal traffic stop that then evolved into an unlawful Terry stop. Where officers then recovered a gun, the officers acted on lawfully because they did not have reasonable suspicion at any point to believe that Mr. Jackson was committing anything more than traffic violations. The initial traffic stop began when officers were driving and saw an SUV driving in the opposite direction without tail lights. Causing them to do a U turn, follow that SUV and then learn that the temporary plates were also expired. This is when. Officers initiated the traffic stop. And shown a spotlight into the SUV while it was pulling over. Mr. Jackson was the driver of that SUV. Once he had curbed his SUV, officer Smith approached the driver's side window, asked for license and insurance. Mr. Jackson handed Smith his license and insurance. And then officer Smith, instead of running the license and insurance or looking at them instead, put them in his pocket and continued to talk to Mr. Jackson. During that time, officer Smith testified that Jackson Jackson's hands were shaking and he was breathing heavily. During the conversation, Smith ordered Mr. Jackson to exit his car because he believed he may be concealing contraband based on Mr. Jackson's nervousness. The fact that he took about half a block to curb his SUV. The fact that he was observed bending over in his seat and because there were calls of shots fired in the district that night. After officer Smith ordered Mr. Jackson to exit the vehicle and Mr. Jackson did not, another officer, officer Scanlon. Moved their squad car into a position in front of Mr. Jackson's car that blocked him in so he could not leave. Officer Scanlon then walked over to the driver's side window where officer Smith was. And that is when he observed the gun on the floorboard. At that point, Scanlon reached in through the window to grab Mr. Jackson's hands while Smith at the same time opened the car door and retrieved the gun. While this began as a lawful traffic stop for traffic violations, it converted into an unlawful seizure at the point when officer Smith abandoned the purpose of the traffic stop. By pocketing his license and insurance and continue and continue to question Mr. Jackson. Instead of going back to the squad car and running his license and checking his insurance and doing the routine traffic checks. A traffic stop becomes unlawful when it's prolonged past the time needed to complete the mission of the traffic stop. And when an officer performs actions that detract from the purpose of a traffic stop. The purpose of a traffic stop is to check a driver's license, check if there are any outstanding warrants, inspecting the registration and insurance and generally ensuring the safe operation of vehicles on roads. Mr. Jackson was pulled over for no taillights and for expired temporary plates and he gave officer Smith his insurance and his license when asked. Officer Smith had all of the documents needed to perform checks at that time, but instead he decided to put those documents in his pocket. Instead of running the routine checks and instead continue to talk to Mr. Jackson. When considering whether a initially legal traffic stop was prolonged and turned into an unlawful seizure. Courts should look at not only the time that was spent on the unrelated investigation, but also whether it distracted from the purpose of the stop. And in this case, when officer Smith continued to speak to Mr. Jackson, instead of running the checks that did. That was not diligently pursuing the purpose of the traffic stop, which is to perform those checks and issue tickets. Continuing officer Smith already had all the documents he needed. To issue tickets and so any further conversation with Mr. Jackson at that point would not have given him any more information to pursue the issuance of traffic tickets. He had everything he needed at that point and as our Supreme Court has stated on scene investigations into other crimes. Detours from the mission of a traffic stop. Even if Smith planned on issuing tickets for those violations, he still couldn't legally pursue. Unrelated investigations, like he did by continuing the conversation and. Waiting to resolve issuing traffic tickets until later. And for that reason. Officer Smith abandoned the purpose of the stop and the legality of the traffic stop ended at the point at which. Officer Smith pocketed the license and insurance. And therefore all actions after that were pursuant to an unlawful seizure without reasonable suspicion. A traffic stop can turn into a legal Terry stop if there is reasonable suspicion to believe that. A that the driver was. Committing some other criminal offense. However, in this case, there was no reasonable suspicion. To believe that Mr. Jackson was committing any other crimes, anything else other than traffic violations. And therefore, the. Continued investigation and continued seizure after abandoning the traffic stop was not legal. We have to look to the facts known to officers. To officer Smith at that time. When when he unlawfully seized Mr. Jackson. You've done a, you've done a very good job of giving us the background on the factual background. But yes, 1, 1 thing is sort of stuck in my head here. And that is that if the gun is in plain view. How is that a search of the vehicle? To be contrary. At the point that the gun was that officer Scanlon says that he saw the gun in plain view. Mr. Jackson was subject to an unlawful seizure. At that point, the legality of the traffic stop had already ended. Because Smith had already put the license and insurance in his pocket and stopped. Stop the mission of issuing traffic tickets or doing name checks at that point. So, when Scanlon says that he saw it in plain view, he was not legally. Any place to see it in plain view. And therefore, anything after the pocketing of the license. Is the fruit of an unlawful seizure. Other thing that I don't think you brought up that some might find relevant is the testimony that 1 of the officers. So, a silhouette of the driver descending or going down, reaching down. Toward the floorboard isn't that something that would raise suspicion. That is 1 of the factors that officer Smith testified to when he said that he. Was suspicious of Mr. Jackson, possibly concealing contraband. Um, however, a. A driver, a defendant who moves in a certain way. Does not automatically give give reasonable suspicion of criminal activity. This, even if you were seen to be bending over in a seat. That itself is an innocent act that Mr. Jackson could have. Been doing for a number of innocent reasons. Um, and we know courts have said that. Innocent gestures, such as putting hands and pockets. Or moving hands in certain ways is not itself an indication of any criminal activity. And so, therefore, it doesn't amount to reasonable suspicion. I know that you're familiar with the people versus Jones case where it says that the. Usual traffic stop is more analogous to a Terry investigation stop. Then a formal arrest, you would agree with that, right? Yes, I would. And in terms of the. The way we review it, as we both mentioned. The standard is, is there a reasonable suspicion? And the trial court felt that there was correct and you would, you would disagree with that. Yes, I would disagree that there was reasonable suspicion. Because none of the factors. That were considered amount to reasonable suspicion. There was also. The factors that were also testified to is 1. Nervousness that Mr. Jackson was nervous. Upon officer Smith's approach. A defendant's nervousness when they're pulled over for a traffic stop is not unusual. Smith testified to that himself. Our courts have said that that's not unusual, so that's not a factor in reasonable suspicion. It'd be what was referred to as the prolonged stop or the. The prolonged curbing that it took Mr. Jackson a few seconds or half of a block. To curb his vehicle that that also gave. Officer Smith, you know, suspicions that he was concealing something. However. Taking a few seconds or half a block to move over from the far left lane. To move over 2 lanes is reasonable given. Safety concerns there were other cars on the road that night. Um, Mr. Jackson, I'm sure I wanted to be. Careful that he was not going to emerge into any other cars. Additionally, I don't mean to break in because justice 11 already set the ground rules and we're breaking them, but. Perhaps not 1 single incident that we're describing would give rise to the reasonable suspicion. But would you disagree that a driver whose hands are on the wheel driving leaning forward? Might be 1 factor the length of time that it takes that driver to travel to a safe lane when the testimony is that there is no traffic in the right lane. And then also the nervousness, wouldn't you agree that. These things taken together would give rise to a reasonable suspicion. No, I, I would not agree. Your honor, because even. Because they all could be innocent actions and. When none of them themselves give reasonable suspicion, when you add no reasonable suspicion to no reasonable, reasonable suspicion, even together. Um, courts have said that's. There's still no reasonable suspicion there, even when added together. So I do not believe that the, the totality of all of those together provided. Enough for the officer either. Okay, but let's hear from your colleague. Attorney's office. Thank you. Good afternoon for the record assistant state's attorney, Andrea Salone for the people. May it please the court. Defendant was curved in a Terry stop that started out as a traffic investigation. During which officers developed reasonable articulable suspicion that defendant was committing a crime. A gun was seen in plain view, which was ultimately recovered. Now, this traffic stop occurred. In the summer of 2020 at or around 1140 at night. It's close to midnight 20 minutes from midnight in an area where officers have received numerous calls or reported calls of shots fired. There was looting rampant in the area just the day before. And these officers were assigned to patrol the area because of this. These circumstances, and in so doing, they observe the defendant driving a car with a broken tail light and made a U turn and notice that he had temporary plates on the SUV that he was driving with fully tinted out windows. And they ran the temporary plate while still traveling. Without intruding in or involving themselves with defendant at all. And that came back that his plate was expired. So they decided to effectuate a stop. And it took him unusually a long time to pull over. And in fact, he didn't just pull over. He never pulled over, which is what the rules of the road teach you before bestowing you with the privilege of driving. He pulled into just the second lane of travel and stopped there and it took him over a half block to pull over in this unusual manner. Despite the fact that the testimony on record page 163 was actually that there was nothing stopping him from pulling over and only maybe three other cars on the road. He didn't pull over completely. And when he came to arrest, utilizing the spotlight, officers then observed his silhouette dip down and back up within the same driver's seat. Not across, within the same seat, down and back up. All of these factors are building the temperature of the situation. The defendant then was approached by Officer Smith, who instructed him to roll down all of the windows. These windows were tinted. And then Officer Smith could see with his own eyes that there was only one person in the car, the defendant. And that he had shaky hands and that he was unusually nervous and that he had a heavy breath. They spoke between 15 and 30 seconds. And then Officer Smith asked the defendant or ordered him to step out of the car. The defendant did not step out of the car. He had to ask the defendant to step out of the car multiple times. The defendant did not step out of the car. To the point where Officer Scanlon then felt it was necessary to move the squad car around and reposition it in front of defendant's car to prevent him from fleeing. Walking back from that moved squad car, Officer Scanlon, with the benefit of a handheld flashlight, then observed through the window in plain view at defendant's feet, a gun. He alerted to his partners who then Smith opened the driver's side door and reached in and grabbed the gun. He did not search the passenger compartment. He did not search the trunk. He went in and performed a limited recovery of that gun. We'll be asking that you uphold the trial court's finding that of denying this motion and that the trial court was correct in that. Now, the defendant here argues that the officers unlawfully prolonged the stop. But it was really defendant's unusual behavior that prolonged the stop. Building in the context of all of his actions, the totality of the circumstances, his behavior of not pulling over right away in the context of this situation that the officers find themselves patrolling in where they're concerned about calls that were coming in that shots were being fired. Seeing him take so long to pull over and then not pulling over all the way, dipping down as if concealing something, Officer Smith testified all of those things went into his belief that he had formed after talking to the defendant for 15 to 30 seconds that the defendant was concealing what Officer Smith called contraband. That he was concealing something. And at that point, that tipping point, he asked the defendant outside of the car. Despite being lawfully ordered to exit under Pennsylvania v. Mims, he obstructed police directives multiple times. So all of these actions, when combined with the surrounding circumstances, escalated a need for a protective search. Asking him out of the car doesn't deviate from the mission of the traffic stop as defendant is trying to color this. Traffic stops are inherently dangerous. Arizona v. Johnson and People v. Sorensen have repeated this. Johnson does not require these police officers to overlook signs that their safety may have been at risk. And that's precisely what defendant is asking this court to do. For the officer not to utilize his ability under Pennsylvania v. Mims and under Johnson and Sorensen to have someone that he is now suspicious of may be concealing contraband in the context of all that's going on that evening to ask him to get out of the car for that officer's own safety. Instead, at that same moment, the officer clears up both hands by putting the license and the insurance in his pocket. And this defendant would have instead the officer turn his back, go back to his car and write a ticket for a equipment violation instead of following the law under Rodriguez, which says that officers are able to make ordinary inquiries, including checking licenses, but they are also allowed to attend to safety-related concerns. Now, if we go with defendant's argument that this was way too long because he talked, Smith talked to defendant for between 15 and 30 seconds. Defendant supports that argument using a case of people v. Ruffin, which is not analogous here because the defendant in Ruffin was put in cuffs and taken to the back of the squad car in that matter, where then he was questioned in totality for over 20 minutes about unrelated things such as his travel plans and ended up making an admission to possessing, I think it was cannabis in his car. Which the officer had no thought or reason to believe he had before he made this admission during their 20 plus minute conversation. That then led the officer to do a full search of the car, including the passenger compartment and the trunk. And that's not what we have here. That's what courts are referring to when they're saying that this encounter was too long or the traffic stop was prolonged. Courts are not asking officers to ignore their observations that give them a reasonable suspicion that other crimes are occurring. They're not asking for officers to turn a blind eye while they're issuing equipment citations or even moving violations. There is nothing in the record regarding what the content of their 15 to 30 minute conversation was, but we know because Officer Smith testified that he was making observations of the defendant. That then, chronologically speaking, led Officer Smith to ask the defendant to get out. And after which you have a series of obstructions and then scandal and moving the car as he testified to prevent the defendant from fleeing. Which is proportionate and reasonable to do because officers need to control a situation without escalating it unnecessarily. And I think it goes without saying that anyone fleeing in a car could have in the past caused officers a great deal of bodily harm. Despite what defendant argues now, the record shows that the testimony was that the defendant wasn't blocked in. First of all, he's in the lane of travel and there was one squad car so he could have easily backed out, which was also the testimony. But as a necessary measure to ensure safety, Sorensen wasn't under any type of limitation, not required to wait for an actual flight attempt to take this preventative measure. Okay, I'll ask you to wrap up. Okay, um, we believe that the gun being in plain view gave them probable cause to to reach in and take the The gun there. The trial court so ruled. And it is also Clear that seeing a gun in plain view is contrary to the pointed CCL act defendant himself testified. I had a gun and I didn't want them to see it. That is presumptively It's a huge flag that he's Affirm the trial courts. The defendants aren't habitual criminal conviction and from the trial courts motion ruling. Thank you. Any questions. No, I just would like to point out, Miss Sloan said 15 to 30 minute minute break. And it was really 15 to 30 seconds. So Thank you, Justice. Yes, I misspoke. I meant 15 to 30 seconds. Right seconds. And that could change the entire outcome. Okay, let's hear rebuttal. Thank you. Um, I'd like to touch on a few points. First, the fact Smith did not need to turn his back to Mr. Jackson in order to perform to perform those checks. He was not at a safety risk. There were three other officers around him. That he could have handed the license off to to perform the check while he remained at the window. If he was concerned about turning his back. Also, As opposing counsel brought up that this was 15 to 30 seconds. Courts do not only focus on the timing of extending the stop, but also if there were there was unrelated investigation that was that interrupted the purpose of the stop and delayed the purpose of the stop the purpose of the stop was to Investigate and issue traffic tickets. And so continuing to ask questions was unrelated to the purpose of that stop. As laid out in the case of people, the casino where they called the Hertz rental car company before issuing the traffic ticket. I believe it was for speeding. That was unnecessary because it was unrelated to issuing the the speeding ticket and the court was not concerned with the time that it took, but more about the action that was unrelated to doing the diligent pursuit of the traffic investigation. As far as the topic of the factor that there were calls of shots fired in the area. At that time, it was calls of shots fired and looting in the district. The district is Covers many neighborhoods and is not an exact location. Officer Smith testified that there were no calls that described either that SUV or of a person fitting Mr. Jackson's description specifically involved in those calls and therefore that that those were not particular eyes to him and cannot be a reason. To believe that he was involved in any criminal activity and does not amount to a reasonable suspicion. Also, as far as ordering Mr. Jackson to exit at that point that he issued the exit order. Officers were already past the point of the lawful traffic stop and Mr. Jackson was unlawfully detained at that time. Officer Smith did not order him to exit the car due to routine due to a routine traffic stop. He himself said he was ordering him to exit because he believed that he was concealing contraband. Notably, also, Officer Smith did not testify that he was afraid for his safety and that was why he was ordering him to exit. He never said that he was afraid for his safety. He never said that he thought that Mr. Jackson was dangerous, only that he thought he might be concealing contraband that he might be armed and that he might flee. And so him ordering him to exit for safety reasons is not the testimony. Additionally, even if the gun was seen in plain view, seeing a gun in plain view is no longer an indication of criminal activity. And officers have to first ask if that gun is being lawfully possessed with a FOID and a CCL. This district has said that officers cannot do a system of seeing a gun, arresting, and then doing checks to see if that gun was lawfully possessed. But instead, they need to question about a CCL prior to arresting. And so seeing the gun in plain view also didn't provide probable cause for the immediate seizure of Mr. Jackson. I finally would like to touch on the fact that as far as Officer Smith, seeing any bending movement from behind is highly improbable because of the tinted windows, the fact that the seats were tall. At one point, Officer Smith even testified himself that you could not see much of the driver because of how large the seats were. And so his own testimony is contradictory. He says that he can see the silhouette bending down and back up, but yet says the seats cover most of a body. And he certainly was not able to see Mr. Jackson's hands. Additionally, this gun was very, very small. The testimony is that it was three to four inches and fit in the palm of your hand. And it was covered with tape on the handle. Officer Smith was standing there at the driver's side window for that time and never saw this gun. He testified that he could only see Mr. Jackson's knees and then his torso, his knees and above, and he could see his hands the whole time he was standing there and couldn't see to the floorboard because the knees were obstructing it. And this gun was tiny. And so it also, I argue, goes against the manifest weight of the evidence that Scanlon would have been able to even observe this gun on the floorboard between Mr. Jackson's knees as he was walking up. And for all of these reasons, I'm arguing that there was no reasonable suspicion to expand the initially lawful traffic stop into the Terry stop because none of the factors provide reasonable suspicion of any criminal activity. And therefore, it was error for the circuit court to deny the motion to suppress. And for this reason, and also for my second briefed argument, I am asking that this court reverse Mr. Jackson's conviction. Thank you. No questions for me. Anybody else? None for me. Thank you. One thing I wish it wasn't called a Terry set, you know, personally. Slap out names here. Okay, thanks everybody for your hard work, your great briefs and you're engaging our argument here today. We will take the matter under advisement and get back to you with an opinion.